James L. MELDON, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE.

Nos. 11543, 11544.

United States Court of Appeals Third Circuit.

Argued April 22, 1955.

Filed Aug. 23, 1955.

Robert E. Kline, Pittsburgh, Pa. (Enoch C. Filer, Erie, Pa., on the brief), for petitioner.

David O. Walter, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

STALEY, Circuit Judge.

These appeals concern the tax liability of James L. Meldon (taxpayer) for the years 1943 and 1945. After separate proceedings, the tax court decided that taxpayer owed tax deficiencies of $22,573.05 for 1943 and $202,547.75 for 1945. In addition, 50% fraud penalties of $11,336.36 for 1943 and $101,773.88 for 1945 were imposed.

These appeals by the taxpayer from the separate decisions entered for the two years were argued together and are

covered by this opinion, although each year presents separate and independent questions. We will first consider the year 1945.

On January 31, 1945, the taxpayer entered into a written agreement with members of the Pattan family for the purchase of the Erie Casket Company stock. The purchase price was $500,000 of which $115,000 was to be paid immediately and $385,000 was to be paid over a three-year period. Upon complete payment of the purchase price, the stock was to be transferred to the taxpayer. Subsequently, Pattan wanted to cancel the deal in order to take advantage of a more lucrative offer from another party. On June 25, 1945, the agreement was cancelled, and payments which had theretofore been made by the taxpayer were returned plus $226,961.54. The June 25, 1945, date and the $226,961.54 profits are not disputed facts.

The tax court treated the taxpayer's rights under the January 31, 1945, agreement as capital assets and determined that they were acquired on January 31, 1945, the date of the written agreement, and sold on June 25, 1945. Therefore, the holding period was less than six months and the profit was to be treated as a short-term capital gain.[1]

The taxpayer's quarrel is with the determination that his holding period was less than six months. He claims that his acquisition date was prior to January 31, 1945 (we are not told specifically at what date but only that it was early enough to make the holding period, which ended on June 25, 1945, more than six months) and that the written agreement of January 31, 1945, was but a memorial of an oral agreement in effect prior to that date.

To sustain his position, the taxpayer points out that $107,000 of the $115,000 down payment required by the written agreement was paid to Pattan in government bonds before the written agreement was signed,[2] and that in November of 1944 the Casket Company transferred to Pattan a life insurance policy which it carried on Pattan. The written agreement provided for the transfer of this asset. The occurrence of these two events prior to the written agreement is clear evidence, according to the taxpayer, that the written agreement was but a memorial of an already completed oral agreement. Among other arguments put forth to further sustain his contention, taxpayer tells us that in the latter part of 1944 he began spending time at the Casket Company (for which services he was later paid), and this he would not have done had there been no agreement in effect.

But this evidence to which taxpayer refers does not stand alone in the record. There was sufficient evidence that, although certain things were done in contemplation of an agreement, no such agreement was in effect prior to January 31, 1945. The taxpayer testified that these events took place because an oral agreement was in effect, but the tax court obviously disbelieved his testimony and accepted that of Pattan and Pattan's attorney, whose combined testimony was that, although negotiations and discussions between Pattan and the taxpayer began in the summer of 1944, no final agreement was reached before the written agreement was signed. Several drafts of proposals were drawn, both by the taxpayer and Pattan's attorney. None of them were acceptable. The agreement that was signed was drafted in January of 1945. According to Pattan's attorney, this included various items which were not contained in other proposals. These included a prohibition against assignment; a provision that if the taxpayer died before rendering complete performance, the contract was to be cancelled and all payments refunded;

1. 26 U.S.C. § 117(a) (2) (1952).

2. The exact date of delivery was not established in the tax court, although the record indicates that delivery occurred more than six months before June 25, 1945, and we have so assumed.

and a provision that no dividends were to be paid by the Company. The only part of the original proposal that survived all negotiations was the over-all purchase price of $500,000. From Pattan's testimony and that of his attorney, the conclusion was warranted that certain events took place because an agreement was contemplated—not because one was already in effect. The tax court decided that the turning over of $107,000 worth of government bonds was done only as evidence of good faith. The taxpayer himself in an affidavit which was introduced as Exhibit 7–G, along with certain stipulations, stated:

> "The purpose of paying Mr. Pattan the $107,000 just as soon as I had collected them was in order to assure him of my genuineness and that I could handle the purchase besides the fact that I was then engaged by the Erie Casket Company at the salary named which commenced November 1945 [sic]."

We are told that the parties were laymen and did not concern themselves with legal niceties, but that for all practical purposes they considered that an agreement had been made prior to January 31, 1945. But, as we have indicated, the evidence, except for taxpayer's testimony, is to the effect that although they may have assumed that sooner or later they would reach agreement, neither entered into nor considered that he had entered into a binding agreement until January 31, 1945. The record discloses sufficient evidence to sustain the tax court's conclusion that taxpayer's acquisition date was January 31, 1945, and so its determination must be sustained.

■ The taxpayer also objects to the tax court's determination that his failure to report the $226,961.54 profit in 1945 was fraudulent and asks that we reverse the imposition of the 50% fraud penalty. Taxpayer did not report the $226,961.54 gain in his 1945 return. In 1946, the taxpayer filed a declaration of estimated tax for 1946 and later a revised estimate. Neither mentioned the profit, but his 1946 return, filed in 1947, reported the gain as a long-term gain on a capital asset acquired on January 4, 1945, and disposed of in early 1946. Taxpayer concedes that the gain should have been reported in 1945.

We think the government met its burden of establishing fraud. Taxpayer, who had been employed by the Bureau of Internal Revenue between 1918 and 1924 (first as a deputy collector and later as assistant to the Revenue Agent in Charge at Pittsburgh, Pennsylvania), had a substantial accounting practice in Erie, Pennsylvania, during the period 1924 to 1945. He prepared monthly financial statements and tax returns for the company, and prepared Pattan's 1945 individual return, in which he did not report anything having to do with Pattan's transactions in Casket Company stock. Taxpayer's explanation was that Pattan had advised him that he had not recovered his cost. The tax court thought the explanation wanting because of evidence that on or about July 6, 1945, taxpayer prepared a calculation indicating that Pattan had realized a $410,550.39 gain on the two transactions with the taxpayer and the other purchaser. It was only after taxpayer had knowledge that Pattan had hired another accountant to file an amended return for 1945 (which return included the Casket Company stock transactions) that he reported the gain on his 1946 return. In addition, neither the taxpayer nor Pattan maintained any book records or original documents concerning the transaction.

Petitioner's explanation of his failure to report the gain in 1945 was that his wife was ill and, as a result, he was not responsible for his actions. We think that, in light of the evidence and the substantial nature of the transaction, taxpayer's explanation was properly rejected by the trial court. It is difficult to believe that the taxpayer when he filed his return forgot a gain of over $200,000. The tax court's imposition of the fraud penalty must be sustained.

■ The taxpayer asserts as prejudicial error the admission in evidence of two exhibits, X and Y. In the tax court's opinion, it is specifically pointed out that " * * * we have not given any consideration to the matters contained in exhibits X and Y which were received in evidence over the objection of the petitioner." Introduction of evidence in a court of law which is later disregarded because of court instructions occurs almost every day during which a jury or a judge sits. In view of the tax court's statement and the taxpayer's failure to show any real prejudice, we cannot sustain his position that the error in admitting the exhibits (if it was error) warrants a new trial.

■ The deficiency for the year 1943 was determined by the tax court after finding the following facts: In 1934 the taxpayer, James L. Meldon, was appointed as permanent receiver of Theo. J. Ely Mfg. Co., Girard, Pennsylvania (Elyco). At that time, Elyco had accounts payable of approximately $9,000 and outstanding first, second, and third mortgages totalling approximately $25,000. By September, 1939, the taxpayer had purchased the first and second mortgages and the debts of Elyco. In 1941, the taxpayer acquired the assets of the C. E. Carter Company and the Harrington Machine Tool Company. The assets of these companies were mingled with the assets of Elyco. In purchasing the mortgages, debts, and other properties, the taxpayer used his own money, but the purchases were made for Elyco's benefit. Elyco therefore was indebted to the taxpayer in the amount of his advances minus any reimbursement he had received. At the end of 1941, taxpayer owned no stock in Elyco. He was only the receiver of the company and a creditor in his individual capacity. On March 28, 1942, the taxpayer, as "owner and receiver" of Elyco, contracted with one Oas to sell all of the assets and business of Elyco, including the business and assets of the Carter and Harrington companies. On May 1, 1942, Oas took over the assets and continued the operation of the business. Seventy-five thousand dollars was the final agreed purchase price, which was to be paid in $200 weekly installments, commencing the week of May 1, 1942. Complete payment was to occur by May 1, 1952. Each month, from May 1942 through January 1944 (at which time the entire $75,000 had been paid), Oas made payments which ranged from approximately $1,000 to $15,000. These payments were appropriated by the taxpayer to his own individual use as soon as received.

Since Elyco was indebted to the taxpayer because of his advances, the first $34,703.96 received from Oas was considered a reimbursement to the taxpayer for the advances. Therefore, all of Oas' payments in 1942 and his total payments from January through May of 1943, plus part of his June 1943 payment, were considered reimbursements.

■ By the time the $34,703.96 debt was paid off, the taxpayer owned all 290 shares of Elyco. Since he continued to appropriate to his own use all funds paid by Oas, the tax court held that a complete liquidation of Elyco was effected and that taxpayer had a short-term capital gain because he had held all shares of stock for less than six months.

The taxpayer objects to the tax court's conclusions and puts forth the theory that when he purchased the Carter and Harrington assets in 1941 he did so for his own benefit and so owned them personally. The sale to Oas was then a sale of Elyco properties (minus Carter and Harrington) by the taxpayer as receiver and a sale of Carter and Harrington assets by the taxpayer personally. On this theory, the taxpayer argues that a certain amount of the $75,000 received from Oas was to pay for the Carter and Harrington assets which he had owned personally for more than six months, and any profit on this part of the sale would be long-term gain to the taxpayer personally. We must reject the taxpayer's contention because sufficient support for

the tax court's conclusions is found in the record. There was evidence that the taxpayer advanced money to Elyco from time to time for current operations. When the taxpayer purchased the debts and mortgages with his own funds, he was reimbursed to the exact penny for the amount paid for the first mortgage, which, of course, indicates that the fact that taxpayer used his funds did not mean he was acting for himself. When the Carter and Harrington assets were purchased, they were transferred to Elyco's plant and commingled with Elyco's assets. This fact, coupled with taxpayer's custom of advancing funds, warranted a conclusion that he acted for Elyco and not himself in purchasing other properties. The tax court also considered that this view was more reasonable because the taxpayer, as receiver, was a fiduciary, and as such was not free to take advantage of corporate opportunities for himself personally. The evidence was sufficient without this supporting legal doctrine, but it certainly added reason to the tax court's findings. It is true that the Carter and Harrington assets were not carried on Elyco's books, but the taxpayer on various occasions referred to these assets as belonging to Elyco. We also note that the taxpayer in his 1944 return considered his profit as a profit from the Elyco stock. None of the profits were reported to be from the sale of Carter and Harrington assets. There was no evidence that taxpayer's personal books and records contained any indication that he owned the Carter and Harrington assets, and in the sale to Oas there was no breakdown of purchase price to indicate that Elyco was to receive part of the price for its assets and the taxpayer individually was to receive the rest. There was one purchase price for all the assets, including the Carter and Harrington assets.

The evidence clearly warrants the finding that all assets on Elyco property were owned by Elyco and that the taxpayer was only a creditor for the sums he had advanced to Elyco.

But, although the tax court was justified in its general view of the situation, one point is not clear. The tax court's opinion indicates that the distributions made to the taxpayer were made by Elyco in periodic installments as the money was received from Oas. But the tax court also found that the taxpayer's holding period for all the stock was less than six months. If the tax court concluded that a complete distribution took place at the moment the taxpayer was completely reimbursed for his advances of $34,703.96 and when he owned all the stock, and that what the taxpayer received at that time (which, no doubt, would be sometime in June 1943) was Elyco's rights in the contract with Oas, then the fair market value of those rights would have to be used in determining the taxpayer's short-term gain. 26 U.S.C. §§ 115(c) and 111(b). The fair market value might or might not be equal to the full amount then due from Oas.

But if the tax court found that the taxpayer received a series of distributions, each one in partial liquidation of Elyco, then each payment when distributed by Elyco would have to be allocated pro rata to each share of stock. On this basis, each distribution would be in partial exchange for the stock, and, once the cost on each share had been recovered, the later pro rata payments received each month would be long-term gains on those shares which had been held at least six months. Some payments then on some shares would constitute long-term gains; others short-term gains. (It seems, of course, that at least until after July 22, 1943, all payments would be short term, because it is only after that date that the holding period for the first 50 shares acquired would be six months or more.)

We think the findings are inconsistent in that if distributions were made by Elyco periodically, the finding that all gain was short term would be incorrect.

On this point alone, we are remanding the cause to the tax court with instruc-

tions that it make findings as to whether distribution was of Elyco's contract with Oas, in which case the short-term gain to the taxpayer would be measured by the fair market value of the contract rights; or, on the other hand, whether liquidation was effected by a series of distributions, each a partial liquidation, in which case some of taxpayer's gain, as indicated, would be long term. Upon its findings, the tax court should recompute the taxpayer's deficiency for 1943.

■ The imposition of the 50% fraud penalty for the 1943 deficiency is assigned as error, but the evidence justified the penalty.

It is certainly clear that the taxpayer, who was on a cash basis, received the payments from Oas in 1943 and appropriated them to his own use. The taxpayer's explanation as to why he did not report the payments in 1943 was not believed by the tax court. The tax court found that the record was "replete with misrepresentations and false information furnished by Meldon to the taxing authorities and to the court having jurisdiction of the receivership \* \* \*."

Meldon was an accountant with a considerable tax practice. He had at one time been an agent for the Internal Revenue Bureau. In this light, since the taxpayer "did not keep accurate records and failed to preserve and protect the books and records of the various companies involved to enable their production at the trial," the tax court concluded that the deficiency was due to fraud. The record supports the tax court's finding of fraud.

We find no merit to other questions raised by the taxpayer.

For the reasons given, the decision in No. 11,544 will be affirmed, and the decision in No. 11,543 [3] will be vacated and the cause remanded for further proceedings consistent with this opinion.

---

3. The decisions of the tax court are not officially reported.