EMMETT F. DIEHL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Diehl v. Commissioner
Docket No. 8276-78.
United States Tax Court
T.C. Memo 1982-23; 1982 Tax Ct. Memo LEXIS 725; 43 T.C.M. (CCH) 308; T.C.M. (RIA) 82023; January 13, 1982. *725 Petitioner was an Internal Revenue Service Revenue Agent assigned to audit a corporation's 1969 employment taxes. Petitioner thereafter filed a false audit report in that he suggested minor adjustments to the corporation's 1969 and 1970 taxes while the unpaid taxes were actually in excess of $ 120,000. Respondent determined that petitioner received $ 10,000 from the corporation in return for the false audit report. Held, petitioner has not sustained his burden of proof and respondent's deficiency determination is sustained.Held further, petitioner is not liable for the addition to tax provided under section 6653(b). Emmett F. Diehl, pro se. Robert Marino, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent has determined a deficiency in petitioner's 1971 Federal income tax of $ 3,543 and an addition to petitioner's tax for that year under section 6653(b)[1] of $ 1,772.The issues for decision are whether petitioner received unreported income from a bribe during 1971 and, if so, whether any part of the resulting underpayment in petitioner's tax for 1971 was due to fraud on the part of petitioner. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by *727 this reference. Petitioner was a resident of Rahway, New Jersey, at the time he filed his petition herein. Petitioner timely filed his 1971 Federal income tax return using the cash method of reporting. On May 17, 1948 petitioner was employed by the Internal Revenue Service at Newark, New Jersey, as a tax accounting clerk. Sometime around February 14, 1954 petitioner became an Internal Revenue Service Revenue Agent. In April of 1971 petitioner was assigned to audit the employment taxes of Power-Flow, Inc. (hereafter referred to as Power-Flow) for the calendr year 1969. Power-Flow is a New Jersey corporation which employed engineers, designers and draftsmen for the purpose of supplying general engineering services to other companies. Power-Flow also engaged in general construction work and operated a "job shop," through which Power-Flow supplied temporary help to other employers. During 1969 through 1971 Edward Krogstad (Korgstad) and Thomas Siggia (Siggia) were the President and Vice-President of Power-Flow, respectively. Power-Flow employed about 250 employees at that time. Power-Flow reported its income and deductions on the basis of a calendar year. In 1969, Power-Flow *728 retained John Battraglino (Battaglino) as comptroller. Prior to 1969 Battaglino, an accountant, had worked for 3 years as an Internal Revenue Service Revenue Agent. When Battaglino arrived at Power-Flow he discovered the company's financial records were in disarray. Battaglino thereafter endeavored to organize these records and through these efforts determined that Power-Flow had a cash flow problem. Battaglino decided that Power-Flow's cash flow problem was due to the employment of too many office personnel. During the second quarter of 1969 Power-Flow encountered financial difficulty. Battaglino met with Krogstad and Siggia and told them that in order to provide more working capital Power-Flow could either lay off or fire numerous office personnel or stop paying Federal withholding taxes. Krogstad and Siggia chose the latter alternative. Battaglino thereafter prepared a false Form 941, Employee's Quarterly Federal Tax Return, for each of Power-Flow's next six quarters, commencing with the quarter ended June 30, 1969 and terminating with the quarter ended September 30, 1970. These forms were false in that they only listed the office personnel of Power-Flow. The withheld *729 employment taxes of the unlisted Power-Flow employees were not paid over by Power-Flow but were instead used to finance its operations. By the fourth quarter of 1970 Power-Flow's financial condition had improved to the point that its officers decided to discontinue the filing of false Form 941s. Power-Flow's unreported employment taxes in 1969 and 1970 were approximately $ 46,521.05 and $ 77,559.20, respectively. During this period Power-Flow also employed Joseph Vetere (Vetere) as an independent accountant. Vetere had also previously served as an Internal Revenue Service Revenue Agent. Vetere prepared Power-Flow's quarterly statements from its general ledger. Vetere did not know that Power-Flow had been filing false employment tax returns. In April 1971 petitioner sent an appointment letter to Battaglino regarding an audit of Power-Flow's 1969 employment taxes to which petitioner had been assigned. This letter proposed an appointment for May 5, 1971 at Power-Flow's place of business in Linden, New Jersey, and requested Battaglino to make the following data available: copies of Power-Flow's 1969 Federal Employment Tax Returns and Corporate Income Tax Returns, 1969 payroll *730 records, 1969 cash disbursement books, accountant's work papers and a reconciliation of the salaries and wages listed on the employment tax returns with those listed on the corporate income tax returns. Battaglino then showed the letter to Krogstad and Siggia and told them that an audit would surely discover the discrepancy in Power-Flow's employment taxes. [2] Krogstad and Siggia decided that Battaglino should consult with Vetere regarding the audit. Vetere told Battaglino that he (Vetere) may be able to "work with" petitioner on the audit. Krogstad and Siggia agreed that Vetere should handle the audit and do whatever was required to pass the audit. Petitioner was acquainted with both Battaglino and Vetere prior to the audit. *731 On May 5, 1971, petitioner and Vetere met for the audit. Battaglino provided Vetere with Power-Flow's 1969 corporate records but was not present during the audit. Only petitioner and Vetere attended the audit. After petitioner left the audit, Vetere told Battaglino that petitioner was willing to cooperate for $ 10,000. Vetere suggested that he and Battaglino take an additional $ 10,000 each, for a total of $ 30,000. Battaglino then told Krogstad and Siggia that petitioner wanted $ 30,000. Krogstad and Siggia agreed to pay petitioner $ 30,000 if petitioner would clear Power-Flow for its 1970 employment taxes as well. On May 19, 1971, Battaglino prepared a check for $ 12,000, payable to "Cash." [3] Battaglino deposited $ 2,000 in Power-Flow's petty cash account and gave $ 10,000 to Krogstad to deliver to Vetere. Krogstad thereafter told Battaglino that he gave $ 10,000 to Vetere who, in turn, told Battaglino that "everything has been taken care of." Battaglino was doubtful whether Vetere had ever paid petitioner and thought Vetere may have kept the money himself. *732 During 1971 petitioner submitted his audit report on Power-Flow to the Internal Revenue Service. Petitioner's audit report appeared detailed and referred to several of Power-Flow's corporate records as the bases for petitioner's conclusions, although petitioner had in fact only examined copies of Power-Flow's false employment tax returns. Petitioner's Power-Flow audit report recommended additional Federal unemployment taxes for 1969 and 1970 of $ 364.25 and $ 628.35, respectively, which adjustments were agreed to by Krogstad. [4]
Sometime in February or March of 1975 petitioner was subpoenaed by a Federal grand jury. Petitioner was questioned about his audit of Power-Flow and denied that he had accepted any money from Power-Flow in connection with the audit. On March 1, 1975, petitioner, Battaglino and Vetere met in a bar in West Orange, New Jersey. Prior to this meeting, and unknown *733 to petitioner and Vetere, Battaglino had agreed to allow employees of the Internal Revenue Service's Internal Security Division to conceal a tape recorder and a transmitter on his person. [5] Battaglino's purpose in the meeting was to obtain petitioner's admission that he had received money from Power-Flow. At this meeting Battaglino, Vetere and petitioner discussed the grand jury investigation and the false Form 941s filed by Power-Flow. Methods of concealing the false returns were also discussed. Petitioner suggested that they agree to state that Krogstad had kept any money withdrawn from Power-Flow for an alleged bribe and was using petitioner, Battaglino, and Vetere to shield himself. Petitioner suggested that Battaglino deny ever taking money to "make a payoff." Petitioner never admitted taking any cash from Power-Flow despite several references by Battaglino to a "deal." On March 10, 1975, Battaglino telephoned petitioner. This conversation was *734 also recorded. Throughout the ensuing conversation Battaglino referred to $ 30,000 and stated that he wanted to know that petitioner got his $ 10,000 to ensure that everybody (petitioner, Battaglino and Vetere) was being honest with each other. Petitioner stated that "as far as I know I didn't get anything" and "Well as far as I'm concerned I got nothing." On April 30, 1976, petitioner, Vetere and Krogstad were indicted by the Federal grand jury in and for the district of New Jersey.[6] Count I of the indictment charged, in pertinent part: 7. That from at least as early as July 1969 to on or about March 10, 1975, in the District of New Jersey, the defendants EDWARD KROGSTAD, JOSEPH VETERE and EMMETT F. DIEHL knowingly and wilfully did conspire, combine, confederate, and agree together with each other, with John Battaglino and Thomas Siggia and with others unknown to the Grand Jury to defraud the United States by impeding, impairing, obstructing, and defrauding the lawful governmental functions of the Internal Revenue Service, Department of the Treasury of the United States, in the ascertainment, *735 computation, assessment and collection of employees payroll withholding taxes withheld by Power Flow, [7] Inc., and to commit certain other offenses against the United States in furtherance thereof in violation of Title 18, United States Code, Sections 1001 and 2 and in violation of Title 26, United States Code, Section 7206(1). 9. In or about April 1971, Power Flow, Inc. received an audit notice from the Internal Revenue Service indicating that EMMETT F. DIEHL, a revenue agent, would conduct an audit and accounting of the books and records of Power Flow, Inc. in order to verify the true number of employees employed at Power Flow, Inc., and the amount of employees' withholding taxes owed to the Internal Revenue Service for period in or about 1969. 10. It was further a part of the conspiracy that EDWARD KROGSTAD, John Battaglino and Thomas Siggia agreed to inform JOSEPH VETERE of the Internal Revenue Service audit notice because JOSEPH VETERE was acquainted with and knew EMMETT F. DIEHL. 11. It was further a part of the conspiracy *736 that EDWARD KROGSTAD and JOSEPH VETERE agreed to induce EMMETT F. DIEHL, to submit a false Internal Revenue Service audit report covering up the materially false statements contained in Power Flow, Inc.'s Employer's Quarterly Federal Tax Returns for the second, third, and fourth calendar quarters of 1969 and the first, second, and third calendar quarters of 1970. 12. It was further a part of the conspiracy that EMMETT F. DIEHL agreed to submit a false Internal Revenue Service audit report covering up the false and fictitious statements contained in Power Flow, Inc.'s Employer's Quarterly Federal Tax Returns for the second, third, and fourth calendar quarters of 1969 and the first, second, and third calendar quarters of 1970. 13. It was further a part of the conspiracy that in or about March, 1975 EMMETT F. DIEHL and JOSEPH VETERE and John Battaglino discussed the hiding and concealing the acts in furtherance of the conspiracy. 14. It was further part of the conspiracy that the defendants EDWARD KROGSTAD, JOSEPH VETERE, and EMMETT F. DIEHL performed and caused to be performed other acts for the purpose of hiding and concealing and causing to be hidden and concealed, the purpose *737 of, and acts in furtherance of, the conspiracy, all in violation of Title 18, United States Code, Section 371. OVERT ACTS
At the times hereinafter mentioned, the following overt acts were committed in furtherance of said conspiracy and to effect the objects thereof: 4. On or about April 15, 1971, JOSEPH VETERE, met with John Battaglino and agreed to induce EMMETT F. DIEHL to file a false audit report covering up false Employer's Quarterly Tax Returns, Forms 941, of Power Flow, Inc. 5. On or about August 30, 1971, EMMETT F. DIEHL submitted a false and fraudulent Internal Revenue Service audit report on Power Flow, Inc., to the Internal Revenue Service, knowing said report to be false. All in violation of Title 18, United States Code, Section 371. Count V of the indictment charged petitioner, Krogstad and Vetere with violations of 18 U.S.C. sections 2 and 1001. On July 13, 1976 petitioner plead guilty to Count I of the indictment in the United States District Court, District of New Jersey. Petitioner's first attempt to plead guilty was rejected by the District Court when petitioner insisted that *738 he did not know that the copies of Power-Flow's Form 941s supplied by Vetere were false. Thereafter, petitioner admitted that he knew that the Form 941s were false at the time of the audit and that he knew at the time that his audit report was filed that the report was also false. The District Court then accepted petitioner's guilty plea. On September 16, 1976 judgment was entered finding petitioner guilty of 18 U.S.C. section 371.
Respondent issued a statutory notice of deficiency on April 14, 1978 in which it was determined that petitioner had not reported a $ 10,000 bribe from Power-Flow in 1971 and that petitioner was liable for the section 6653(b) addition to tax. OPINION Respondent's first contention is that petitioner intentionally filed a false audit report regarding Power-Flow's 1969 and 1970 employment taxes for which petitioner received an unreported $ 10,000 bribe. Petitioner maintains that he negligently prepared the audit report based solely on the information provided by Vetere, Power-Flow's outside accountant, and that he received no consideration from Power-Flow in exchange for such audit report. Power-Flow was a corporation engaged *739 in three different businesses. Upon discovery of a cash flow problem, the President (Krogstad) and Vice-President (Siggia) of Power-Flow decided to pay over only a portion of the company's quarterly employment taxes. To this end Power-Flow's comptroller (Battaglino) prepared false Form 941s for six consecutive quarters. The false Form 941s listed only a fraction of Power-Flow's employees.Power-Flow utilized the withheld but unpaid employment taxes to strengthen itself financially. In April of 1971 petitioner, an Internal Revenue Service Revenue Agent, was assigned to audit Power-Flow's 1969 employment taxes. Petitioner met with Power-Flow's accountant (Vetere) and thereafter filed an audit report recommending minor changes for 1969 and 1970. Petitioner's audit was superficially conducted; petitioner only inspected copies of Power-Flow's false Form 941s. However, petitioner's audit report, which was approved upon a routine review, recounted a detailed audit procedure. Petitioner, Krogstad and Vetere were subsequently indicted by a Federal Grand Jury. Prior to the indictment petitioner had two conversations with Battaglino concerning their involvement in the conspiracy. Unbeknownst *740 to petitioner these conversations were recorded. Petitioner did not at any time, either during these conversations or elsewhere, admit taking any money from Power-Flow. Petitioner did suggest that he, Battaglino and Vetere agree to tell the authorities that Krogstad probably kept any money taken out of Power-Flow for the alleged purpose of bribing petitioner. Petitioner later plead guilty to one count of conspiracy to evade the income tax. Petitioner's guilty plea was rejected by the District Court for the District of New Jersey when petitioner asserted that the audit report was merely the result of petitioner's negligence. Petitioner's guilty plea was only accepted when petitioner admitted that he filed an audit report which he knew at the time to be false. Petitioner bears the burden of proving that he did not receive the amount determined by respondent. Rule 142(a), Tax Court Rules of Practice and Procedure. Based on the record petitioner has not met his burden. Petitioner was an experienced revenue agent assigned to audit a corporation's employment tax records. Petitioner *741 conducted an extremely limited audit but submitted an audit report which described an audit procedure sufficiently detailed to be approved on review. A routine audit would have certainly uncovered the unpaid taxes. Petitioner attributes the limited nature of the audit solely to his own negligence in accepting copies of the false employment tax returns from Power-Flow's outside accountant, who petitioner knew as a former revenue agent. However, petitioner plead guilty to a charge of conspiracy resulting from his Power-Flow audit. Petitioner's plea of guilty was only accepted by the District Court when petitioner retracted the account of the audit he adheres to in the instant proceeding and admitted that he knew that the audit report was false when he submitted it. Petitioner claims that this guilty plea was solely made on the advice of counsel to avoid the time and expense of a lengthy trial. However, petitioner's activities after his grand jury appearance demonstrate that petitioner was an active and willing participant in the conspiracy.Petitioner made numerous suggestions to Vetere and Battaglino regarding what account of the event the three of them should relate to the grand *742 jury. Petitioner also suggested that they state that any money which was obtained from Power-Flow was probably ketp by Krogstad and thus that should Krogstad suggest that petitioner, Vetere and Battaglino had received money such a suggestion would only be made by Krogstad to protect his (Krogstad's) interests. Petitioner's conduct belies his stated purpose behind the guilty plea. Furthermore, the fact that petitioner may have wished to avoid a lengthy trial does not mean that his guilty plea was otherwise meaningless. While petitioner has steadfastly denied accepting any money for the Power-Flow audit we believe that based upon petitioner's experience, petitioner's conduct and the record as a whole petitioner's denial is insufficient to meet his burden of proof. We must therefor sustain respondent's determination on this issue. Respondent has also determined that petitioner is liable for the addition to tax under section 6653(b), which provides, in part: If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall *743 be added to the tax an amount equal to 50 percent of the underpayment.* * * The burden of proof on this issue is upon respondent, section 7454(a). Respondent must show by clear and convincing evidence, Rule 142(b), Tax Court Rules of Practice and Procedure, that petitioner knowingly understated his taxable income with the intent to evade tax, Pendola v. Commissioner, 50 T.C. 509 (1968). Proof of fraud is frequently made through the use of circumstantial evidence. Stoltzfus v. United States, 398 F.2d 1002 (3rd Cir. 1968). Respondent asserts that petitioner accepted a $ 10,000 bribe which petitioner, by reason of his "special knowledge" of the Internal Revenue laws, knew to be taxable income. [8] Because petitioner failed to report this income respondent concludes that such failure was due to fraud, replying upon Meldon v. Commissioner, 225 F.2d 467 (3rd Cir. 1955), affg. T.C. Memo. 1954-120 and affg. in part and vacg. and remg. in part a Memorandum Opinion of this Court dated October 30, 1953; Pendola v. Commissioner, supra. *744 Although respondent's conclusion regarding petitioner's "special knowledge" of the income tax laws may be correct, respondent has not shown that petitioner received any cash from Power-Flow. For this reason we hold that petitioner is not liable for the section 6653(b) addition to tax. Fraud is not to be presumed or imputed, Carter v. Campbell, 264 F.2d 930 (5th Cir. 1959). Respondent's determination of the applicability of the fraud penalty is largely dependent upon a finding of an omission of income from petitioner's 1971 tax return. We must be cautious not to transmute petitioner's failure to satisfy his burden of proof as *745 to the deficiency determined by respondent into an essential fact needed in order to satisfy respondent's burden of proof on the issue of fraud.[9]
*746 In Meldon, the taxpayer was a former Bureau of Internal Revenue deputy collector and assistant to the Revenue Agent in Charge in Pittsburgh, Pennsylvania, who conducted a substantial accounting practice. In finding the taxpayer liable for the fraud addition the Third Circuit considered the taxpayer's expertise in tax matters. Unlike the present case there was no dispute that the taxpayer received the proceeds upon which the fraud addition was based for one taxable year and the Court found that the taxpayer actually received the funds upon which the fraud addition was based for a second taxable year. Similarly, in Pendola the taxpayer, an Internal Revenue Service office auditor, not only admitted receiving bribes but conceded his liability for the fraud addition for the amounts admittedly received. The taxpayer only disputed the amounts of the deficiency and the fraud addition. Thus, Meldon and Pendola are inapposite without proof of petitioner's receipt of a bribe from Power-Flow. [10]
*747 Respondent first points out that petitioner filed a false audit report concealing a large sum of unpaid taxes. Respondent concludes that petitioner would not have done so without the receipt of substantial consideration from Power-Flow. Respondent relies heavily on the testimony of Battaglino. Although petitioner has not shown that he did not receive the amount determined by respondent, petitioner's failure to do so does not establish his receipt of such amount. Battaglino testified that he gave $ 10,000 to Krogstad to be delivered to Vetere, who would then pay petitioner. Krogstad told Battaglino that he gave money to Vetere. Vetere told Battaglino that "it has been taken care of." Neither Krogstad nor Vetere testified herein and petitioner denies accepting any money from Power-Flow. Battaglino admitted that he and Vetere agreed to obtain an additional $ 20,000 from Krogstad, to be divided evenly between themselves, by telling Krogstad that petitioner demanded $ 30,000 rather than $ 10,000 to submit a false audit report. Krogstad was convicted of a violation of 18 U.S.C. section 2 (causing, aiding and abetting an offence against the United States). *748 [11] Vetere, who allegedly paid the $ 10,000 to petitioner, was suspected by Battaglino of keeping this $ 10,000. Thus, not only is Battaglino's testimony of a payment to petitioner a third-hand account of the alleged bribe, but each declarant in this account is lacking in credibility. At least three other parties to the conspiracy--Battaglino, Krogstad, and Vetere--could have appropriated the money allegedly intended for petitioner. Further, petitioner testified, albeit somewhat unconvincingly that he knew Vetere and Battaglino beforehand, and merely negligently accepted Vetere's figures as a favor to them. Petitioner's denials to Battaglino that he received a bribe from Power-Flow may well have been made for the sake of appearances. These conversations contain no persistent denials or demands for money by petitioner such as would probably have occurred had petitioner not received some monetary consideration for his audit report. On balance, however, we cannot say that petitioner received the alleged bribe, receipt of which would serve as the exclusive foundation for the imposition of *749 the addition to tax for fraud. See footnote 9. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. All statements made by Krogstad, Battaglino and Vetere relating to the conspiracy described hereafter are admissible evidence herein by reason of Rule 801(d)(2)(E), Federal Rules of Evidence, which states: 801. Definition. (d) Statements which are not hearsay. A statement is not hearsay if-- (2) Admission by party-opponent. The statement is offered against a party and is * * * (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.↩
3. The check was drawn on the account of P.F.I. Technical Service, Inc. (P.F.I.). P.F.I. was organized in the fourth quarter of 1970 and employed most of the employees who were not reported on Power-Flow's false Form 941s, so that Power-Flow's corrected Form 941s would not reflect a grossly disproportionate number of employees.↩
4. Petitioner's audit report was reviewed when submitted and, with the exception of a minor mathematical error, was approved by the reviewer. Although petitioner was assigned only to audit Power-Flow's 1969 taxes petitioner's recommendations for both 1969 and 1970 were approved on review.↩
5. The conversation was recorded by the concealed tape recorder and two other tape recorders (placed in automobiles located in the bar's parking lot) which recorded transmissions received through the automobiles' radios.↩
6. The indictment also named Battaglino and Siggia as unindicted co-conspirators.↩
7. Although the indictment uses an unhyphenated version of the corporation's name the correct version is hyphenated.↩
8. It is well settled that the proceeds of illegal activities are income. James v. United States, 366 U.S. 213 (1961) (embezzlement proceeds); Rutkin v. United States, 343 U.S. 130 (1952) (extortion proceeds); United States v. Sullivan, 274 U.S. 259↩ (1927) (gains from illicit traffic in liquor).
9. In this regard what we said in Ginsburg v. Commissioner, T.C. Memo. 1976-199, is quite relevant: In the usual situation, the taxpayer has the burden of proof as to respondent's determination of a deficiency while the respondent has the burden of proof as to the existence of fraud, a burden which he must satisfy by clear and convincing evidence. Section 7454; Rule 142(a) and (b), Tax Court Rules of Practice and Procedure; Kathleen C. Vannaman, 54 T.C. 1011, 1017 (1970); Jacob D. Farber, 43 T.C. 407, 419 (1965), affirmed in a supplemental opinion 44 T.C. 408 (1965); Luerana Pigman, 31 T.C. 356, 370 (1958). Here the allegation of fraud is inextricably related to the allegation of omission of income--some $ 415,000 of purported executors' commissions claimed by respondent to have been paid through the discharge and satisfaction of purported indebtedness of Jane. In this context, we are required to exercise care so that we do not allow the conclusion that petitioners have failed to carry their burden of proof as to the underlying deficiency--or, the flip side of that burden of proof, namely the so-called presumptive correctness of respondent's determination of an omission of income--to furnish the exclusive foundation for the conclusion that respondent has carried his burden of proof as to fraud. Driebourg v. Commissioner, 225 F.2d 216, 218, (6th Cir. 1955), affirming in part a Memorandum Opinion of this Court; C.A. Reis, 1 T.C. 9, 13 (1942); Peter Mazzoni, T.C. Memo. 1970-37, affd. sub. nom, Estate of Mazzoni v. Commissioner, 451 F.2d 197 (3rd Cir. 1971); Grant Foster, T.C. Memo. 1965-246 affd. as to the fraud issue 391 F.2d 727 (4th Cir. 1968). To do so otherwise would cause us to run afoul of the mandates that fraud will not be imputed or presumed and that mere suspicion of fraud is insufficient, E.g. Carter v. Campbell, 264 F.2d 930, 935↩ (C.A. 5, 1959).
10. Respondent also cites Meller v. Commissioner, T.C. Memo. 1957-18, in which petitioner, a deputy collector of internal revenue, plead guilty to charges of accepting money to influence his decision in pending matters. Thus, in Meller↩, the petitioner's receipt of cash was not in dispute.
11. See United States v. Krogstad, 576 F.2d 22↩ (3rd Cir. 1978).