GODFRED FRED FUGGER (FRED G. FUGGER), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fugger v. Commissioner
Docket No. 6890-74.
United States Tax Court
T.C. Memo 1985-14; 1985 Tax Ct. Memo LEXIS 619; 49 T.C.M. (CCH) 483; T.C.M. (RIA) 85014; January 9, 1985. Godfred Fred Fugger, pro se. Lynn L. Casimir, for the respondent. PARKER MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent has determined a deficiency in petitioner's Federal income tax in the amount of $278,030.70 and an addition to tax under section 6653(b) [1] in the amount of $139,015.35. The issues for decision are (1) whether petitioner received unreported income from certain transactions in stolen *620 securities, and (2) whether petitioner is liable for the fraud addition under section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Philadelphia, Pennsylvania at the time he filed his petition in this case.Petitioner and his wife, Norma, filed a joint Federal income tax return for 1968 with the Internal Revenue Service District Director at Philadelphia. During 1968, petitioner was a major shareholder in Tilecast Corporation (Tilecast) and was its plant manager. Petitioner had also been a shareholder and officer of Simplex Pre-Cast Tile Co. (Simplex), apparently Tilecast's predecessor. Petitioner became acquainted with Anna Trautmann (Ms. Trautmann) in 1956 when she invested in Simplex. During 1968, Ms. Trautmann, by then an elderly woman, had approximately *621 $4,000 invested in Tilecast. Petitioner secured a power of attorney from Ms. Trautmann, dated June 18, 1968, designating him as her agent and authorizing him to execute any and all documents, stocks, stock powers, checks, drafts or other matters relating to her stocks and/or bonds. That power of attorney included endorsing and cashing checks or drafts drawn to the order of Anna Trautmann.Ms. Trautmann signed the power of attorney based on petitioner's assurances to her that it was for the benefit of Tilecast. On June 21, 1968, the brokerage firm of Bruns, Nordeman & Co. (Bruns-Nordeman) sold shares of stock for the account of Ms. Trautmann; in that transaction petitioner acted under the power of attorney. The brokerage firm issued a check in the amount of $35,350.21 payable to Ms. Trautmann as proceeds from the sale of the stock. On June 28, 1968, petitioner "cashed" that check at the Garden State Bank in the manner described below. On June 28, 1968, petitioner opened a checking account, No. XXX-976-2, in the name of Ms. Trautmann at the Garden State Bank of New Jersey. Petitioner was the authorized signatory on this account, pursuant to the power of attorney from *622 Ms. Trautmann. Petitioner made the initial deposit into that account by endorsing (as Ms. Trautmann's "agent" under the power of attorney) and negotiating the $35,350.21 check from Bruns-Nordeman. On July 6 and 7, 1968, petitioner, pursuant to the power of attorney from Ms. Trautmann, sold shares of stock through Bruns-Nordeman. On July 11, 1968, Bruns-Nordeman issued a check payable to the order of Anna Trautmann in the amount of $13,398.22. On July 12, 1968, petitioner negotiated this check at the Garden State Bank, receiving cash therefor. Using the power of attorney from Ms. Trautmann, petitioner also opened a brokerage account in her name at E.W. Smith Co., Inc. (E. W. Smith), with Mr. Alfred Sharp (Sharp) as the account executive. Petitioner represented to Sharp that he was acting for Mr. Trautmann under the power of attorney. Petitioner did not inform Ms. Trautmann of the E. W. Smith account he had opened in her name, and Ms. Trautmann had no knowledge of that brokerage account. On July 30, 1968, petitioner, under the power of attorney from Ms. Trautmann, sold shares of stock through E. W. Smith. Petitioner received a check from E. W. Smith payable to the *623 order of Ms. Trautmann in the amount of $8,734.31. Petitioner endorsed this check (under the power of attorney from Ms. Trautmann) and cashed it at the Garden State Bank on August 2, 1968. Because the securities that petitioner wanted to sell were in the "street name," not in Ms. Trautmann's name, E. W. Smith would not pay petitioner until five business days after he had presented the securities for sale, but petitioner wanted the money right away. Sharp advised petitioner that he could receive money more quickly by using the securities as collateral for bank loans and then having the bank sell the securities. On at least three occasions in 1968, petitioner did so, through the following steps. First, petitioner pledged securities to the Garden State Bank as collateral for a demand loan (in Ms. Trautmann's name pursuant to the power of attorney). Petitioner than signed the required Federal banking form for a pledge of securities. The Garden State Bank then loaned approximately 50 percent of the value of the pledged securities, depositing the loan proceeds into the Garden State Bank account in Ms. Trautmann's name. Next, acting through its correspondent bank, the Garden *624 State Bank presented the pledged securities to E. W. Smith for sale. E. W. Smith then sold the securities and remitted the proceeds to the Garden State Bank and/or petitioner as described below. Each of these transactions took approximately 10 days to two weeks. As a result of these three transactions, petitioner obtained the following loans from the Garden State Bank in Ms. Trautmann's name: Date
Amount
August 20, 1968
$25,000
October 24, 1968
60,000
December 19, 1968
110,000
All of the proceeds of these loans were credited to the Garden State Bank account in Ms. Trautmann's name. [2]
With respect to the August transaction, E. W. Smith remitted $25,000 *625 of the proceeds of the sale of the securities to the bank, which applied the funds to the outstanding $25,000 loan in Ms. Trautmann's name. E. W. Smith remitted the balance of the proceeds from the sale in two checks payable to the order of Ms. Trautmann in the respective amounts of $12,115.68 and $1,000. On August 28, 1968, petitioner endorsed these two checks (under the power of attorney from Ms. Trautmann), and negotiated them for cash at the Garden State Bank. With respect to the October transaction, E. W. Smith remitted the entire amount of the sales proceeds to the Garden State Bank. The bank applied $60,000 of the proceeds to the loan in Ms. Trautmann's name, and after withholding $155 for interest and a service fee, credited the remaining $60,997.84 to the Garden State Bank account in Ms. Trautmann's name. With respect to the December transaction, the events are a little more complicated. Sharp was directed by an officer of the Garden State Bank to sell the securities pledged for the December 19 loan. On December 30, 1968, petitioner repaid the December 19 loan in Ms. Trautmann's name with $110,000 in cash. Upon repayment of the loan, petitioner discovered *626 that the bank had already delivered the pledged securities to E. W. Smith for sale. On December 30, petitioner contacted Sharp to try to prevent or rescind the sale. E. W. Smith had already sold the securities, so petitioner directed Sharp to repurchase them. [3] These repurchases were not debited to the Anna Trautmann account at E. W. Smith until January 7, 1969. As of the end of 1968, the credit balance in the brokerage account at E. W. Smith was $141,286.33; the remaining proceeds from the sale of securities delivered by the Garden State Bank ($50,764.82) were not credited to the account in Ms. Trautmann's name until January 2, 1969. On February 4, 1969, petitioner and his wife traveled to the Bahamas. *627 Petitioner opened a safe deposit box at the Freeport Branch of Barclay's Bank into which he placed the securities E. W. Smith had repurchased at his direction in January. The securities remained in this safe deposit box until 1971, when the box was opened by the Bahamian Government under court order and the contents removed and photocopied. On September 12, 1968, petitioner cashed at the Garden State Bank a Chase Manhattan "official check" in the amount of $85,000 drawn to the order of Samuel Krimstock. Petitioner made the original endorsement in Krimstock's name, as well as the secondary endorsement in Ms. Trautmann's name (under the power of attorney from her). During 1968, petitioner drew the following checks on the Garden State Bank account in Ms. Trautmann's name: Date
Amount
June 28, 1968
$ 30,500.00
July 19, 1968
4,600.00
August 20, 1968
25,000.00
October 24, 1968
55,000.00
November 4, 1968
5,000.00
November 7, 1968
55,000.00
November 12, 1968
5,700.00
December 19, 1968
100,000.00
Total
$280,800.00 Each of these checks was for cash, and petitioner endorsed the back of each check under the power of attorney from Ms. Trautmann. *628 In addition, petitioner received the following amounts of cash from other transactions, described above, that he had conducted in Anna Trautmann's name: Date
Transaction
Amount
July 12, 1968
Bruns-Nordeman check
$ 13,398.22
August 2, 1968
E. W. Smith check
8,734.31
August 28, 1968
E. W. Smith Checks
13,115.68
September 12, 1968
Samuel Krimstock check
85,000.00
Total
$120,248.21
Thus from the various stock transactions he conducted in Ms. Trautmann's name, petitioner received during 1968 at least $401,048.21 in cash. Anna Trautmann never owned any of the stocks involved, and she never received any of this money. On February 14, 1969, petitioner, acting under the power of attorney for Anna Trautmann, attempted to pledge shares of stock for an interim loan at the Garden State Bank. During the course of this loan application, it was discovered that the stocks were stolen. All of the securities that petitioner pledged and sold in 1968 were stolen, part of a larger theft of approximately 21 million dollars worth of securities stolen from E. F. Hutton in May or June of 1968. At the time he pledged or sold these various securities in 1968, petitioner *629 knew these securities had been stolen. On March 8, 1973, petitioner pled guilty to one count of an eight count Federal indictment charging him with conspiracy in 1968 to deal in stolen securities. Among the allegations of the count to which petitioner pled guilty were charges that from August 1968 through January of 1970 petitioner conspired to deal in stolen securities in that he pledged securities for loans in the name of others (ostensibly the security owners), sold securities through a Bahamian bank whose records were made secret under local law, and cashed a Chase Manhattan "official check" in the amount of $85,000 on or about September 10, 1968, at a New Jersey bank. Petitioner's co-conspirator in the conspiracy indictment was one Martin Forman. Also on March 8, 1973, petitioner pled guilty to one count of a five count Federal indictment charging him with interstate transportation of stolen securities in 1968. On June 12, 1973, petitioner pled nolo contendere to a charge of income tax evasion under section 7201 of the Internal Revenue Code for the year 1968. On the joint return he filed with his wife for the taxable year 1968, petitioner *630 reported adjusted gross income of $20,554.37, of which $20,465 was reported on Line 5 (Wages, salaries, tips, etc.) of his Form 1040. In his statutory notice, respondent determined that petitioner had received and omitted from his return gross income of $398,178.04 from these securities transactions. [4] Accordingly, respondent determined the deficiency and fraud addition now in issue. *631 ULTIMATE FINDINGS OF FACT 1. Petitioner understated his taxable income and underpaid his tax liability in 1968. 2. Petitioner's underpayment of tax was due to fraud, i.e., a willful intent to evade tax. OPINION Using a power of attorney from an elderly woman, Anna Trautmann, petitioner engaged in numerous transactions, pledging and selling various stolen securities. He received over $400,000 in cash from these transactions. The securities did not belong to Anna Trautmann; she was unaware of these transactions, and she received none of the money. Amounts received by a taxpayer under a claim of right without restriction upon disposition must be included in his gross income. North American Oil v. Burnet,286 U.S. 417 (1932). This rule applies with full force to taxpayers who receive income from illegal activities or sources. James v. United States,366 U.S. 213 (1961); Goodwin v. Commissioner,73 T.C. 215, 230-231 (1979). The record in this case overwhelmingly establishes that petitioner received at least the amount of gross income determined by respondent from his transactions involving stolen securities. *632 Petitioner denied that he signed any of the checks on the Anna Trautmann checking account or the various loan documents. However, his testimony was completely rebutted by the testimony of officials of the bank and brokerage firm and by the testimony of respondent's expert witness, a questioned documents examiner or handwriting expert. The handwriting expert unequivocally identified the signatures on the various checks and other documents as petitioner's. Petitioner contends that he was an unknowing messenger simply transporting securities and monies for others, particularly Martin Forman, his co-conspirator in the securities indictment. Petitioner's story is facially implausible and is contradicted on every critical point by the objective evidence of record. Petitioner's story, itself internally inconsistent, is wholly unworthy of belief. Petitioner had unrestricted power over the proceeds of these transactions in stolen securities; such amounts are properly taxable to him. Petitioner's three "loan" transactions with the Garden State Bank were simply part of the overall sale of the stolen securities. These "loans" were repaid out of a portion of the sales proceeds *633 of the securities and consequently have not been included twice or otherwise improperly included in petitioner's gross income. Although petitioner repaid the December loan in cash, rather than directly from the sale of the stolen securities, the credit balance in the E. W. Smith brokerage account at the end of 1968 from the sale of those securities ($141,286.33) more than offsets the $110,0000 of the "repaid loan." Like the Garden State Bank account and the securities themselves, the E. W. Smith brokerage account in the name of Anna Trautmann was, for tax purposes, petitioner's account and not Anna Trautmann's. Petitioner, having absolute dominion and control over that account, is properly taxable on those sums. Sec. 1.451-2, Income Tax Regs.; Baker v. Commissioner,81 F. 2d 741 (3d Cir. 1936), affg. 30 B.T.A. 188 (1934); Burrows v. Commissioner,38 B.T.A. 236, 237 (1938). Respondent has the burden of establishing petitioner's fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971). Respondent must establish (1) that petitioner underpaid his taxes, and (2) *634 that part of petitioner's underpayment was due to fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983); Goodwin v. Commissioner,supra,73 T.C. at 226-227. Respondent has clearly carried the first part of his burden, for the evidence overwhelmingly establishes that petitioner received and failed to report income from the sale of stolen securities. Respondent has also satisfied the second portion of his burden. The fraud envisioned by section 6653(b) is "actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968); Wilson v. Commissioner,76 T.C. 623, 633-634 (1981). Respondent must show that petitioner intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent collection of such taxes. Stoltzfus v. United States,supra;Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968); *635 Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Fraud is a factual question to be determined on the basis of the entire record. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, petitioner's entire course of conduct must be considered and his fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978); Stone v. Commissioner,supra,56 T.C. at 223-224; Otsuki v. Commissioner,supra,53 T.C. at 105-106. The omission of a substantial amount of taxable income is an indicium of fraud. Holland v. United States,348 U.S. 121, 139 (1954); Agnellino v. Commissioner,302 F. 2d 797, 801 (3d Cir. 1962). Here, even though only a single tax year is involved, petitioner's omission of almost $400,000 in gross *636 income while reporting only $20,000, standing alone, is strong evidence of his fraudulent intent. See Meldon v. Commissioner,225 F. 2d 467, 470, 473 (3d Cir. 1955); Dorsey v. Commissioner,33 B.T.A. 295 (1935); Tanner Oil Co. v. Commissioner,20 B.T.A. 794, 795 (1930). [5] "[A] willful attempt to evade tax may be found from any conduct calculated to mislead or conceal." Beaver v. Commissioner,55 T.C. 85, 93 (1970). See Stoltzfus v. United States,supra.Petitioner's fraudulent conduct towards the Garden State Bank and the brokerage houses, not to mention his use of the elderly Anna Trautmann as his front for dealing in stolen securities, justifies the inference that petitioner likewise intended to defraud the Government. Other factors indicating fraud in this case include petitioner's dealing in large amounts of cash and his use of a bank in a tax haven jurisdiction whose records are kept secret by local law. Based on this record, we are completely persuaded that petitioner's underpayment of his tax liability was attributable to his fraudulent intent to evade his legitimate tax liability. *637 Accordingly, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, unless otherwise noted. All references to "Rules" are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Petitioner, painting himself as a simple messenger carrying securities to the bank or brokerage houses and later picking up cash to deliver to one Martin Forman, denies that the loan proceeds were credited to the Trautmann bank account. However, all of the bank records and all of the testimony of officials of the bank and brokerage houses show that the loan proceeds were credited to that bank account, and that petitioner later received cash by writing checks on that account made out to cash.↩
3. The brokerage account ledger and the testimony of the broker (Sharp) clearly show that the securities pledged for the December 19 loan had been delivered to and sold by E. W. Smith. Consequently, we disregard the parties' contrary stipulation that petitioner "obtained the certificates which he originally had pledged as collateral" from the bank when he repaid the loan on December 30. See Jasionowski v. Commissioner,66 T.C. 312, 318↩ (1976).
4. Respondent's determination of these items in his statutory notice was based, in part, on deposits to the Anna Trautmann account at the Garden State Bank rather than on checks that petitioner draw on that account. This results in respondent's figure of $291,328.05 rather than the $280,800 figure we have used in connection with the Trautmann account. The difference, other than minor service charges, is one check drawn in the amount of $10,000; that cancelled check is not part of the record. Accordingly, we have disregarded the $10,000 item because we cannot find that petitioner cashed that check. Also, respondent's determination did not include the Bruns-Nordeman check for $13,398.22 that petitioner cashed on July 12, 1968. These two differences account for the discrepancy between respondent's unreported income figure of $398,178.04 and the total $401,048.21 figure that we determined represents the cash petitioner actually received and possessed in 1968 from the securities transactions. Respondent has not sought an increased deficiency, and we will not further consider the matter.↩
5. See also JCAJ Investments, Inc. v. Commissioner,T.C. Memo. 1979-34; Benn v. Commissioner,T.C. Memo. 1966-8, affd. per curiam 394 F. 2d 505 (5th Cir. 1968); Nelson v. Commissioner,T.C. Memo. 1964-100; Estate of Santuccio v. Commissioner, a Memorandum Opinion dated April 11, 1952 (11 T.C.M. 343↩, 21 P-H Memo T.C. par. 52,102).